## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JONATHAN WONG, derivatively on behalf of ACACIA COMMUNICATIONS, INC.,<br><br>  Plaintiff,<br><br>vs.<br><br>MURUGESAN SHANMUGARAJ, JOHN F. GAVIN, BENNY P. MIKKELSEN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, ERIC A. SWANSON, STAN J. REISS, PETER Y. CHUNG, JOHN RITCHIE, and VINCENT T. ROCHE,<br><br>  Defendants,<br><br>and<br><br>ACACIA COMMUNICATIONS, INC.,<br><br>  Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jonathan Wong ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Acacia Communications, Inc. ("Acacia" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Murugesan Shanmugaraj, John F. Gavin, Benny P. Mikkelsen, Francis J. Murphy, Bhupendra C. Shah, Christian J. Rasmussen, Mehrdad Givehchi, Eric A. Swanson, Stan J. Reiss, Peter Y. Chung, John Ritchie, and Vincent T. Roche (collectively, the "Individual Defendants" and together with Acacia, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Acacia, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and

violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Acacia, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Acacia's directors and officers starting on August 11, 2016 and continuing through the present (the "Relevant Period").

2.     Acacia is a leading provider of high-speed coherent interconnect products designed to improve the performance, intelligence, capacity, and cost of communications networks that are relied upon by cloud infrastructure operators and content and communications service providers.

3.     The Company's products are sold in North and South America, Europe, the Middle East, Africa and Asia.  Acacia's two largest customers during the Relevant Period were ZTE Kangxun Telecom Co. Ltd. ("ZTE") and the North American arm of ADVA Optical Networking ("ADVA").

4.     On May 18, 2016, the Company completed its initial public offering ("IPO") -- in which it issued and sold 4,570,184 shares of common stock for a price per share to the public of $23.00.  Certain stockholders of the Company, including several of the Individual Defendants,

sold an additional 604,816 shares in the IPO. Acacia received aggregate proceeds of approximately $97.8 million from the IPO, net of underwriters' discounts and commissions.

5.      On October 13, 2016, the Company completed a follow-on public offering (the "FPO") -- in which it issued and sold 1,210,302 shares of common stock for a price per share to the public of *$100.00*. Certain stockholders of the Company, including several of the Individual Defendants, sold an additional 3,289,698 shares in the FPO. Acacia received aggregate proceeds of $116.8 million from the FPO, net of underwriters' discounts and commissions.

6.      On October 27, 2016, ZTE and ADVA both provided disappointing guidance for the fiscal quarter ended December 31, 2016, citing issues experienced in the fiscal quarter ended September 30, 2016.

7.      On May 31, 2017, the Company issued a press release disclosing that it had "identified a quality issue" affecting a portion of its units and that it was working with its customers to remediate the issue.

8.      On July 14, 2017, the Company issued a press release expounding on the quality control issue, stating that the Company had identified a circuit board cleaning process as the likely root cause of the issue and that it experienced supply constraints as manufacturing capacity was used to both build replacement units and to meet new demand from customers for the Company's products.

9.      During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) prior to and during the

FPO, the Company was experiencing declining demand for its products from their top two customers, who had experienced sales and operational issues in the quarter ended September 30, 2016, limiting their demand for the Company's products; (2) the Company had manufacturing issues, causing a disruption in the manufacturing, supply, and sales of its products, and thus Company revenues; (3) a substantial portion of Acacia's sales growth prior to its FPO was due to projects that were practically complete or winding down, including China's 4G infrastructure buildout in a vital market, and shrinking demand for the Company's products; (4) ADVA was experiencing issues rolling out its own cloud-based technology using the Company's products, resulting in a reduction in its demand for the Company's products; (5) the Company had quality issues that affected a portion of the units manufactured by one of the Company's three contract manufacturers, caused by a former circuit board cleaning process used by the Company; (6) Acacia was suffering from its attempts to remediate the quality issues while also meeting current demand for the Company's products; and (7) the Company failed to maintain internal controls.

10.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11.     While the price of the Company's stock and the perceived value of the Company was artificially inflated, eleven of the Individual Defendants engaged in insider sales, a substantial amount of which were made during the FPO.

12.     Moreover, the Individual Defendants failed to maintain internal controls.

13.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), among

others,[1] to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the liability of certain of them in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Acacia's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act and the Securities Act of 1933.

---

[1] Defendants Murugesan Shanmugaraj and John F. Gavin are named as defendants in each of the four consolidated actions. Defendants Francis J. Murphy, Mehrdad Givehchi, Bhupendra C. Shah, and Christian J. Rasmussen are named as defendants in only one of the four consolidated class actions.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Acacia.  Plaintiff purchased Acacia common stock early in the Relevant Period and has continuously held Acacia common stock at all relevant times.

### Nominal Defendant Acacia

20.     Acacia is a Delaware corporation with its principal executive offices at Three Mill and Main Place, Suite 400, Maynard, Massachusetts 01754.  Acacia's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "ACIA."

### Defendant Shanmugaraj

21.     Defendant Murugesan Shanmugaraj ("Shanmugaraj") has served as the Company's President and CEO, and as a Company director, since April 2010.  According to the Company's Schedule 14A filed with the SEC on April 6, 2017 (the "2017 Proxy Statement), as of March 31, 2017, Defendant Shanmugaraj beneficially owned 968,036 shares of the Company's common stock, which represented 2.5% of the Company's outstanding common stock.  Given that the price

per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Shanmugaraj owned over $56.7 million worth of Acacia stock.

22.    For the fiscal year ended December 31, 2016, Defendant Shanmugaraj received $2,393,140 in compensation from the Company.  This included $299,923 in salary, $1,707,500 in stock awards, $361,620 in non-equity incentive plan compensation, and $24,097 in all other compensation.

23.    The Company's 2017 Proxy Statement stated the following about Defendant Shanmugaraj:

> *Murugesan "Raj" Shanmugaraj,*[2] 59, has served as our President and Chief Executive Officer and as a Director of our company since April 2010. Prior to joining Acacia, from February 2002 to February 2010, Mr. Shanmugaraj was the vice president of business development in the optical networking division of Alcatel-Lucent USA, Inc., a network equipment manufacturer. Prior to that, Mr. Shanmugaraj founded and served as the chief executive officer of Astral Point Communications Inc., an optical equipment company, which was acquired by Alcatel-Lucent USA, Inc. in 2001, and held various senior executive level positions at PictureTel Corp., a commercial videoconferencing product company, Multilink, Inc., an engineering and product development-based manufacturer of telecommunications network components, and Motorola Inc., a multinational telecommunications company. Mr. Shanmugaraj holds an M.S. in electrical and computer engineering from the University of Iowa and a B.E. in electronics and communications from the National Institute of Technology, Trichy in India. We believe that Mr. Shanmugaraj is qualified to serve on our Board of Directors due to his extensive leadership experience in the optics and network industries, his extensive knowledge of our company and his service as our President and Chief Executive Officer.

24.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Shanmugaraj made the following sales of Company stock (and made no purchases of Company stock).  On October 13, 2016, Defendant Shanmugaraj sold 108,163 shares of Company stock for $96.50 per share. On January 5, 2017, Defendant Shanmugaraj sold 15,000 shares of Company stock for $61.86 per

---

[2] Throughout this Complaint, emphasis is contained in the original unless otherwise noted.

share.  On January 6, 2017, Defendant Shanmugaraj sold 15,000 shares of Company stock for $60.99 per share.  On February 2, 2017, Defendant Shanmugaraj sold 15,000 shares of Company stock $57.81 per share.  On February 3, 2017, Defendant Shanmugaraj sold 11,000 shares of Company stock for $56.68 per share.  On February 14, 2017, Defendant Shanmugaraj sold 2,029 shares of Company stock for $62.24 per share.  On March 1, 2017, Defendant Shanmugaraj sold 7,000 shares of Company stock for $51.63 per share.  On March 2, 2017, Defendant Shanmugaraj sold 7,000 shares of Company stock for $51.21 per share.  On May 15, 2017, Defendant Shanmugaraj sold 8,983 shares of Company stock for $48.52 per share.  Thus, before the fraud was exposed, he sold 189,175 Company shares on inside information, for which he received over $15 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

25.    In the Company's FPO, Defendant Shanmugaraj sold 108,163 shares of Company stock, for which he received over $10.4 million in proceeds.

**Defendant Gavin**

26.    Defendant John F. Gavin ("Gavin") has served as the Company's CFO since February 2012.  According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Gavin beneficially owned 53,116 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Gavin owned over $3.1 million worth of Acacia stock.

27.    For the fiscal year ended December 31, 2016, Defendant Gavin received $1,899,459 in compensation from the Company.  This included $246,808 in salary, $1,410,000 in

stock awards, $213,200 in non-equity incentive plan compensation, and $29,451 in all other compensation.

28.     The Company's 2017 Proxy Statement stated the following about Defendant Gavin:

*John F. Gavin*, 57, who has served as our Chief Financial Officer since February 2012. Prior to joining Acacia, from January 2011 to February 2012, Mr. Gavin was the chief financial officer of Hiperos LLC, a software-as-a-service company. From June 2005 to January 2011, he served as the chief operating officer of Akorri Networks, Inc., a data center virtualization management company, where he also served as the interim acting chief executive officer in 2010. Previously, Mr. Gavin served as the chief financial officer and chief operating officer of SMaL Camera Technologies, Inc., a designer of CMOS digital imaging solutions for a variety of business and consumer applications, the chief financial officer of Pirus Networks, Inc., a provider of multi-protocol storage networking switching products, and the chief financial officer of C-Port Corporation, a developer of CMOS microprocessor-based technologies for communications routers and switches. Mr. Gavin also served in various roles, most recently as the vice president of finance, sales and marketing North America, at Digital Equipment Corporation, a vendor of computer systems, for over 17 years. Mr. Gavin holds a B.S. in accounting from Stonehill College and a M.B.A. from Anna Maria College.

29.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Gavin made the following sales of Company stock (and made no purchases of Company stock).  On October 13, 2016, Defendant Gavin sold 25,501 shares of Company stock for $96.50 per share.  On February 14, 2017, Defendant Gavin sold 678 shares of Company stock for $62.24 per share.  On April 17, 2017, Defendant Gavin sold 17,817 shares of Company stock for $54.79 per share.  On May 15, 2017, Defendant Gavin sold 4,634 shares of Company stock for $48.54 per share.  Thus, before the fraud was exposed, he sold 48,630 Company shares on inside information, for which he received over $3.7 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

30.     In the Company's FPO, Defendant Gavin sold 25,501 shares of Company stock, for which he received over $2.4 million in proceeds.

**Defendant Mikkelsen**

31.     Defendant Benny P. Mikkelsen ("Mikkelsen") has served as the Company's Chief Technology Officer ("CTO") and as a Company director since June 2009.  He is also a co-founder of the Company.  According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Mikkelsen beneficially owned 818,544 shares of the Company's common stock, which represented 2.1% of the Company's outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Mikkelsen owned over $47.9 million worth of Acacia stock.

32.     The Company's 2017 Proxy Statement stated the following about Defendant Mikkelsen:

> *Benny P. Mikkelsen*, 57, one of the founders of our company, has served as our Chief Technology Officer and as a Director of our company since June 2009. Prior to joining Acacia, Mr. Mikkelsen co-founded and served as the vice president of technology of Mintera Corporation, a high-speed transceiver company. Prior to that, he held various engineering positions with Bell Laboratories, a research and scientific development company owned by Alcatel-Lucent USA, Inc. Mr. Mikkelsen holds an M.S. and Ph.D. in electrical engineering from the Technical University of Denmark. We believe that as a founder, and based on Mr. Mikkelsen's deep experience in the optics and network industries, his extensive knowledge of our company and his service as our Chief Technology Officer, Mr. Mikkelsen provides a valuable contribution to our Board of Directors.

33.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Mikkelsen made the following sales of Company stock (and made no purchases of Company stock).  On October 13, 2016, Defendant Mikkelsen sold 98,846 shares of Company stock for $96.50 per share.  On January 5, 2017, the Defendant Mikkelsen sold 77,526 shares of Company stock for $62.29 per

share.  On February 1, 2017, the Defendant Mikkelsen sold 25,842 shares of Company stock for $57.33 per share.  On February 14, 2017, Defendant Mikkelsen sold 2,032 shares of Company stock for $62.24 per share.  On March 1, 2017, Defendant Mikkelsen sold 25,842 shares of Company stock for $51.59 per share.  On April 3, 2017, Defendant Mikkelsen sold 25,842 shares of Company stock for $59.45 per share.  On May 1, 2017, Defendant Mikkelsen sold 25,842 shares of Company stock for $46.67 per share.  On May 15, 2017, Defendant Mikkelsen sold 7,475 shares of Company stock for $48.52 per share.  Thus, before the fraud was exposed, he sold 289,247 Company shares on inside information, for which he received over $20.4 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

34.    In the Company's FPO, Defendant Mikkelsen sold 98,846 shares of Company stock, for which he received over $9.5 million in proceeds.

**Defendant Murphy**

35.    Defendant Francis J. Murphy ("Murphy") has served as the Company Corporate Controller since November 2013.

36.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Murphy made the following sales of Company stock (and made no purchases of Company stock). On November 11, 2016, Defendant Murphy sold 1,582 shares of Company stock for $69.19 per share.  On December 15, 2016, Defendant Murphy sold 3,785 shares of Company stock for $66.79 per share.  On January 3, 2017, Defendant Murphy sold 6,752 shares of Company stock for $62.15 per share.  On January 9, 2017, Defendant Murphy sold 17,157 shares of Company stock for $60.43 per share.  On January 30, 2017, Defendant Murphy sold 1,608 shares of Company stock for $60.67 per share.

On March 31, 2017, Defendant Murphy sold 1,668 shares of Company stock for $60.67 per share. On April 3, 2017, Defendant Murphy sold 1,201 shares of Company stock for $59.46 per share. On April 24, 2017, Defendant Murphy sold 400 shares of Company stock for $52.91 per share. On July 3, 2017, Defendant Murphy sold 305 shares of Company stock for $41.53. Thus, before the fraud was exposed, he sold 34,458 Company shares on inside information, for which he received over $2.1 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

**Defendant Shah**

37.     Defendant Bhupendra C. Shah ("Shah") has served as the Company's Vice President of Engineering since June 2009. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Shah beneficially owned 349,995 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Shah owned over $20 million worth of Acacia stock.

38.     For the fiscal year ended December 31, 2016, Defendant Swanson received $1,894,403 worth of compensation from the Company. This included $246,808 in salary, $1,410,000 in stock awards, and $213,200 in non-equity incentive plan compensation.

39.     The Company's 2017 Proxy Statement stated the following about Defendant Shah:

*Bhupendra C. Shah*, 58, has served as our Vice President of Engineering since June 2009. Prior to joining Acacia, Mr. Shah was the director of engineering at Juniper Networks, Inc., a provider of networking products. Prior to that, he was the director of hardware and software development at Broadcom Corporation, a fabless semiconductor company. Previously, Mr. Shah co-founded and served as the vice president of engineering of Atlantic Cores Incorporated, a developer of standard products and on-chip intellectual property. Mr. Shah holds a B.S. in electrical engineering from the University of Lowell.

40.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Shah made the following sales of Company stock (and made no purchases of Company stock). On October 13, 2016, Defendant Shah sold 47,917 shares of Company stock for $96.50 per share.  On January 5, 2017, Defendant Shah sold 39,180 shares of Company stock for $61.81 per share.  On February 1, 2017, Defendant Shah sold 13,060 shares of Company stock for $57.05 per share. On February 14, 2017, Defendant Shah sold 909 shares of Company stock for $62.24 per share. On March 1, 2017, Defendant Shah sold 13,060 shares of Company stock for $51.92 per share. On April 3, 2017, Defendant Shah sold 13,060 shares of Company stock for $59.49 per share. On May 15, 2017, Defendant Shah sold 5,112 shares of Company stock for $48.53 per share.  Thus, before the fraud was exposed, he sold 132,298 Company shares on inside information, for which he received over $9.5 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

41.     In the Company's FPO, Defendant Shah sold 47,917 shares of Company stock, for which he received over $4.6 million in proceeds.

**Defendant Rasmussen**

42.     Defendant Christian J. Rasmussen ("Rasmussen") has served as the Company's Vice President of Digital Signal Processing and Optics since June 2015.  He is also a co-founder of the Company.

43.     The Company's 2017 Proxy Statement stated the following about Defendant Rasmussen:

*Christian J. Rasmussen*, 48, one of the founders of our company, who has served as our Vice President of Digital Signal Processing and Optics since June 2015 and

previously served as our Director of Digital Signal Processing and Optics from June 2009 to June 2015. Prior to joining Acacia, Mr. Rasmussen was a principal optical engineer of Mintera Corporation, a high-speed transceiver company. Mr. Rasmussen holds an M.S. in electrical engineering and a Ph.D. in optical communications from the Technical University of Denmark.

44.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Rasmussen made the following sales of Company stock (and made no purchases of Company stock). On October 13, 2016, Defendant Rasmussen sold 98,846 shares of Company stock for $96.50 per share.  On January 5, 2017, Defendant Rasmussen sold 77,526 shares of Company stock for $62.29 per share. On February 1, 2017, Defendant Rasmussen sold 25,842 shares of Company stock for $57.42 per share. On February 14, 2017, Defendant Rasmussen sold 3,321 shares of Company stock for $62.24 per share. On March 1, 2017, Defendant Rasmussen sold 25,842 shares of Company stock for $51.61 per share. On April 3, 2017, Defendant Rasmussen sold 25,842 shares of Company stock for $59.43 per share. On May 1, 2017, Defendant Rasmussen sold 25,842 shares of Company stock for $46.63 per share. On May 15, 2017, Defendant Rasmussen sold 10,060 shares of Company stock for $48.52 per share.  Thus, before the fraud was exposed, he sold 293,121 Company shares on inside information, for which he received over $20.4 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

45.     In the Company's FPO, Defendant Rasmussen sold 98,846 shares of Company stock, for which he received over $9.5 million in proceeds.

**Defendant Givehchi**

46.     Defendant Mehrdad Givehchi ("Givehchi") has served as the Company Vice President of Hardware and Software since June 2015.  He is also a co-founder of the Company.

47.    The Company's 2017 Proxy Statement stated the following about Defendant Givehchi:

> *Mehrdad Givehchi*, 51, one of the founders of our company, who has served as our Vice President of Hardware and Software since June 2015 and previously served as our Director of Hardware and Software from June 2009 to June 2015. Prior to joining Acacia, Mr. Givehchi was the consulting optical engineer of Mintera Corporation, a high-speed transceiver company. Prior to that, he served as the principal hardware engineer of Sycamore Networks, Inc., a developer and marketer of intelligent networking products for fixed line and mobile network operators, and as the principal hardware engineer of Tektronix, Inc., a designer of test and measurement equipment. Mr. Givehchi holds a B.S. in electrical engineering from Worcester Polytechnic Institute.

48.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Givehchi made the following sales of Company stock (and made no purchases of Company stock). On October 13, 2016, Defendant Givehchi sold 98,846 shares of Company stock for $96.50 per share.  On January 5, 2017, Defendant Givehchi sold 77,598 shares of Company stock for $61.78 per share.  On February 1, 2017, Defendant Givehchi sold 25,830 shares of Company stock for $57.09 per share. On February 14, 2017, Defendant Givehchi sold 2,039 shares of Company stock for $62.24 per share. On March 1, 2017, Defendant Givehchi sold 25,830 shares of Company stock for $51.88 per share. On April 3, 2017, Defendant Givehchi sold 25,830 shares of Company stock for $59.34 per share. On May 1, 2017, Defendant Givehchi sold 25,830 shares of Company stock for $46.66 per share. On May 15, 2017, Defendant Givehchi sold 7,390 shares of Company stock for $48.52 per share.  Thus, before the fraud was exposed, he sold 289,193 Company shares on inside information, for which he received over $20.2 million.  His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

49.     In the Company's FPO, Defendant Givehchi sold 98,846 shares of Company stock, for which he received over $9.5 million in proceeds.

**Defendant Swanson**

50.     Defendant Eric A. Swanson ("Swanson") has served as a Company director since June 2009.  He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Swanson beneficially owned 2,640 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Swanson owned over $154,756 worth of Acacia stock.

51.     For the fiscal year ended December 31, 2016, Defendant Swanson received $21,754 worth of compensation from the Company in the form of fees.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Swanson:

> *Eric A. Swanson*, 56, has served as the Chairman of our Board of Directors since August 2009. Since 2006, Mr. Swanson has served as a research associate at the Massachusetts Institute of Technology. From January 2004 to September 2016, he provided consulting services to The Charles Stark Draper Laboratory, Inc., an independent not-for-profit laboratory in applied research, engineering development, education and technology transfer. Previously, Mr. Swanson co-founded Sycamore Networks, Inc., a developer and marketer of intelligent networking products for fixed line and mobile network operators, and served as its general manager and chief scientist. Mr. Swanson holds a B.S. in electrical engineering from the University of Massachusetts at Amherst and an M.S. in electrical engineering from the Massachusetts Institute of Technology. We believe that Mr. Swanson is qualified to serve on our Board of Directors due to his extensive experience in the telecommunication and photonics industries, his deep knowledge of our company, and his experience on other boards of directors.

53.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Swanson made the following sale of Company stock (and made no purchases of Company stock).  On October 13,

2016, before the fraud was exposed, Defendant Swanson sold 2,640 shares of Company stock for $96.50 per share, for which he received $254,760. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

54.     In the Company's FPO, Defendant Swanson sold 2,640 shares of Company stock, for which he received $254,760 in proceeds.

**Defendant Reiss**

55.     Stan J. Reiss ("Reiss") has served as a Company director since August 2009. He also serves as Chairman of the Compensation Committee. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Reiss beneficially owned 10,652,116 shares of the Company's common stock, which represented 27.6% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Reiss owned over $624.4 million worth of Acacia stock.

56.     For the fiscal year ended December 31, 2016, Defendant Reiss received $29,951 worth of compensation from the Company in the form of fees.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Reiss:

*Stan J. Reiss*, 45, has served as a Director of our company since August 2009. Mr. Reiss is a general partner of Matrix Partners, a venture capital investment firm specializing in technology companies, where he has worked since July 2000. Prior to that, Mr. Reiss was an engagement manager at McKinsey & Company. Mr. Reiss holds a B.S. in electrical engineering from Cornell University, M.S. degrees in electrical engineering and operations research from the Massachusetts Institute of Technology and an M.B.A. from the Harvard Business School. We believe that Mr. Reiss is qualified to serve as a Director of our company due to his extensive experience as a venture capitalist in the technology sector and his involvement with several private company boards of directors.

58.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Reiss made the

following sale of Company stock (and made no purchases of Company stock).  On October 13, 2016, before the fraud was exposed, Defendant Reiss sold 1,446,104 shares of Company stock for $96.50 per share, for which he received over $139.5 million.  His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the fraud.

59.    Defendant Reiss, through his position as a managing member of Matrix VIII US MC, has sole voting and dispositive power over the shares beneficially owned by entities affiliated with Matrix Partners, which beneficially own 27.6% of Acacia's outstanding common stock.

60.    In the Company's FPO, Defendant Reiss, through entities affiliated with Matrix Partners, sold 1,448,493 shares of Company stock, generating over $139.7 million in aggregate proceeds.

### Defendant Chung

61.    Peter Y. Chung ("Chung") has served as a Company director since April 2013.  He also serves as Chairman of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee and the Compensation Committee.

62.    For the fiscal year ended December 31, 2016, Defendant Chung received $32,474 worth of compensation from the Company in the form of fees.

63.    The Company's 2017 Proxy Statement stated the following about Defendant Chung:

*Peter Y. Chung*, 49, has served as a Director of our company since April 2013. Mr. Chung is a managing director and the chief executive officer of Summit Partners, L.P., a growth equity firm, where he has been employed since 1994. He is currently a director of A10 Networks, Inc., a provider of application networking solutions, and MACOM Technology Solutions Holdings, Inc., a provider of analog semiconductor solutions for use in radio frequency, microwave and millimeter wave applications. Previously, Mr. Chung served as a director of various other entities, including Ubiquiti Networks, Inc., a developer of networking technology

for service providers and enterprises. Mr. Chung holds an A.B. in economics from Harvard University and an M.B.A. from the Stanford University Graduate School of Business. We believe that Mr. Chung is qualified to serve as a Director of our company due to his wide-ranging experience in investment banking, private equity and venture capital investing in the communications technology sector and his participation on other private and public company boards of directors.

64.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Chung made the following sales of Company stock (and made no purchases of Company stock). On October 13, 2016, Defendant Chung sold 346,202 shares of Company stock for $96.50 per share. On March 9, 2017, Defendant Chung sold 1,250,000 shares of Company stock for $50.25 per share. Thus, before the fraud was exposed, he sold 1,596,202 Company shares on inside information, for which he received over $96.2 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

65.     Defendant Chung is Managing Director and the CEO of Summit Partners, L.P., which beneficially owns 3.4% of the Company's outstanding common stock. Per the 2017 Proxy Statement, Defendant Chung is on a two-person investment committee responsible for Summit Partners, L.P.'s voting and investment decisions with respect to Acacia.

66.     In the Company's FPO, entities affiliated with Summit Partners, L.P. sold 346,202 shares of Company stock, receiving over $33.4 million in aggregate proceeds.

**Defendant Ritchie**

67.     John Ritchie ("Ritchie") has served as a Company director since April 2015. He also serves as Chairman of the Audit Committee. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Ritchie beneficially owned 7,920 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $58.62, Ritchie owned over $464,270 worth of Acacia stock.

68.     For the fiscal year ended December 31, 2016, Defendant Ritchie received $85,089 worth of compensation from the Company in the form of fees.

69.     The Company's 2017 Proxy Statement stated the following about Defendant Ritchie:

> *John Ritchie*, 51, has been a Director of our company since April 2015. Since August 2015, Mr. Ritchie has been the senior vice president, chief financial officer of Aerohive Networks, Inc., a computer networking equipment company, and he was also appointed to serve as its chief operating officer in February 2017. From April 2013 to April 2015, Mr. Ritchie served as the chief financial officer of Telerik AD, a software development tools company. Prior to that, from May 2010 to March 2013, Mr. Ritchie was the chief financial officer of Ubiquiti Networks, Inc., a developer of networking technology for service providers and enterprises. Previously, Mr. Ritchie held several executive positions, in each case most recently the position of chief financial officer, at Electronics For Imaging, Inc., a provider of products, technology and services enabling analog to digital imaging transformation, and Splash Technology Holdings, Inc., which develops, produces, and markets color servers. Mr. Ritchie holds a B.S. in business administration from San Jose State University. We believe that Mr. Ritchie is qualified to serve as a Director of our company due to his service as the chief financial officer of several publicly traded companies.

70.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Ritchie made the following sales of Company stock (and made no purchases of Company stock). On October 13, 2016, Defendant Ritchie sold 2,640 shares of Company stock for $96.50 per share. On May 9, 2017, Defendant Ritchie sold 2,640 shares of Company stock for $47.20 per share. Thus, before the fraud was exposed, he sold 5,280 Company shares on inside information, for which he received $379,368. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the fraud.

71.     In the Company's FPO, Defendant Ritchie sold 2,640 shares of Company stock, for which he received $254,760 in aggregate proceeds.

**Defendant Roche**

72.     Vincent T. Roche ("Roche") has served as a Company director since June 2016 and serves as Chairman of the Board.  He also serves as a member of the Compensation Committee.

73.     For the fiscal year ended December 31, 2016, Defendant Roche received $403,613 worth of compensation from the Company.  This included $24,100 in fees and $379,513 in stock awards.

74.     The Company's 2017 Proxy Statement stated the following about Defendant Roche:

> *Vincent T. Roche*, 57, has served as a Director of our company since June 2016. Mr. Roche is the president and chief executive officer and a director of Analog Devices, Inc., a global leader in high-performance semiconductors for signal processing applications, where he has worked since 1988 and has been part of the senior management team since 2009. Mr. Roche holds a B.S. in electrical engineering from the University of Limerick in Ireland. We believe that Mr. Roche is qualified to serve as a Director of our company due to his leadership expertise, including service as chief executive officer of a large international public company, as well as his technical understanding of the optical networking industry.

75.     Defendant Roche is the President and CEO, and a member of the board of directors, of Analog Devices, Inc. ("Analog"), a company that Acacia, through its contract manufacturers, periodically purchases supplies from.  These supplies are used as content in certain of the Company's manufactured products.  In the fiscal year ended December 31, 2016, Acacia's contract manufacturers made purchases from Analog of approximately $4.9 million.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

76.     By reason of their positions as officers, directors, and/or fiduciaries of Acacia and because of their ability to control the business and corporate affairs of Acacia, the Individual Defendants owed Acacia and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Acacia in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Acacia and its shareholders so as to benefit all shareholders equally.

77.     Each director and officer of the Company owes to Acacia and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

78.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Acacia, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

79.     To discharge their duties, the officers and directors of Acacia were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

80.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Acacia, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised Acacia's Board at all relevant times.

81.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

82.     To discharge their duties, the officers and directors of Acacia were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Acacia were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Acacia's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Acacia conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Acacia and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Acacia's operations would comply with all applicable laws and Acacia's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

83.     Each of the Individual Defendants further owed to Acacia and the shareholders the duty of loyalty requiring that each favor Acacia's interest and that of its shareholders over their

own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

84.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Acacia and were at all times acting within the course and scope of such agency.

85.     Because of their advisory, executive, managerial, and directorial positions with Acacia, each of the Individual Defendants had access to adverse, non-public information about the Company.

86.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Acacia.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

87.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

88.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while eleven of the twelve Individual Defendants engaged in insider sales.

89.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Acacia was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

90.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

91.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Acacia, and was at all times acting within the course and scope of such agency.

## ACACIA'S CODE OF CONDUCT

92.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), "the Company has adopted the . . . [Code of Conduct]" in carrying out the "general policy of [Acacia] . . . to conduct its business and activities and transactions with a high level of integrity and ethical standards and in accordance with all applicable laws."  The Code of Conduct states that "[a]ll employees, officers and directors of the Company are expected to comply with all Company policies and rules as in effect from time to time."  The Code of Conduct is distributed to

each of the Company's officers, directors, and employees and each of them is to certify that they have received, carefully read, and understand the Code of Conduct and that they have complied with and will continue to comply with the terms contained therein.

93.     The Code of Conduct provides, as to "Compliance with Laws, Rules and Regulations," that:

> Company policy requires that all employees, officers and directors comply with both the spirit and the letter of all laws, rules and regulations applicable to the Company wherever it does business. Although not all employees are expected to know the details of these laws, you are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice when you are uncertain about them.

> If you become aware of the violation of any law, rule or regulation by the Company, whether by its employees, officers, directors, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the Company's Chief Financial Officer or General Counsel. While it is the Company's desire to address matters internally, nothing in this Code prohibits you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority. Employees, officers and directors shall not discharge, demote, suspend, threaten, harass or in any other manner discriminate or retaliate against an employee because he or she reports any such violation. However, if the report was made with knowledge that it was false, the Company may take appropriate disciplinary action up to and including termination. This Code should not be construed to prohibit you from engaging in concerted activity protected by the rules and regulations of the National Labor Relations Board or from testifying, participating or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation.

94.     The Code of Conduct provides, as to "Conflicts of Interest," that:

> A "conflict of interest" occurs when a person's personal interest interferes with the business interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively. A conflict of interest may also arise with respect to the Company's employment of relatives of and persons with close personal relationships to existing employees, officers or directors. Employees, officers and directors are expected to use good judgment to adhere to high ethical standards and to avoid engaging in any

activity or having a personal interest that creates a potential or actual conflict of interest.

The following are examples of transactions and relationships that create a conflict of interest (whether engaged in by you or by your relatives or other persons with whom you have a close relationship):

\* \* \*

- Use of your position with the Company to influence a transaction with a supplier or customer in which you have any personal interest, other than a financial interest representing less than one percent (1%) of the outstanding shares of a publicly held company.

95.     The Code of Conduct provides, as to "Insider Trading," that:

Employees, officers and directors who have material nonpublic information about the Company or other companies, including our suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as from communicating such information to others who might trade on the basis of that information. To help ensure that you do not engage in prohibited insider trading and avoid even the appearance of an improper transaction, the Company has adopted an Insider Trading Policy, which is available on the Human Resources section of the Company's Intranet.

If you are uncertain about the constraints on your purchase or sale of any Company securities or the securities of any other company that you are familiar with by virtue of your relationship with the Company, you should consult with the General Counsel before making any such purchase or sale.

96.     The Code of Conduct provides, as to "Honest and Ethical Conduct and Fair Dealing," that:

Although the prosperity of our Company depends on our ability to outperform our competitors, the Company is committed to achieving success by fair and ethical means. We seek to maintain a reputation for honesty and fair dealing among our competitors and the public alike. In light of this objective, employees, officers and directors should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees. The Company relies on the judgment of each individual to avoid dishonest and unethical practices. For example, statements about the Company's products and services must not be untrue, misleading, deceptive or fraudulent. In addition, you may not take unfair advantage of anyone through manipulation, concealment, abuse of privileged

information, misrepresentation of material facts or any other unfair-dealing practice.

97.    The Code of Conduct provides, as to "Protection and Proper Use of Corporate

Assets," that:

Employees, officers and directors should seek to protect the Company's assets, including Proprietary Information. Theft, carelessness and waste have a direct impact on the Company's financial performance. Company assets and services should be used solely for legitimate business purposes of the Company and not for any personal benefit or the personal benefit of anyone else. Company computers, servers, equipment and communication systems (such as email) should be used only for legitimate business purposes, although incidental personal use is permitted.

Employees, officers and directors must advance the Company's legitimate interests when the opportunity to do so arises. You must not take for yourself (or for the benefit of anyone other than the Company) personal opportunities that are discovered through your position with the Company or the use of property or information of the Company.

98.    The Code of Conduct provides, as to "Accuracy of Books and Records and Public

Reports," that:

Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.

All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.

It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

99.    The Code of Conduct provides, as to "Reporting and Compliance Procedures," that:

Every employee, officer and director has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding compliance with this Code to his or her supervisor or to the Company's General Counsel or Chief Financial Officer, as described below. Any employee, officer or director who knows or believes that any other employee or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable law or this Code should report such information to his or her supervisor or to the Company's General Counsel or Chief Financial Officer. You may report such conduct openly or anonymously without fear of retaliation. The Company will not discipline, discriminate against or retaliate against any employee who reports such conduct, unless it is determined that the report was made with knowledge that it was false, or who cooperates in any investigation or inquiry regarding such conduct. Any supervisor who receives a report of a violation of this Code must immediately inform the Company's General Counsel and Chief Financial Officer.

* * *

Failure to comply with the standards outlined in this Code will result in disciplinary action including, but not limited to, reprimands, warnings, probation or suspension without pay, demotions, reductions in salary, discharge and restitution. Certain violations of this Code may require the Company to refer the matter to the appropriate governmental or regulatory authorities for investigation or prosecution. Moreover, any supervisor who directs or approves of any conduct in violation of this Code, or who has knowledge of such conduct and does not immediately report it, also will be subject to disciplinary action, up to and including discharge.

100.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, avoid conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

101.    Acacia, incorporated in June 2009, is a leading provider of high-speed coherent interconnect products designed to improve the performance, intelligence, capacity, and cost of communications networks that are relied upon by cloud infrastructure operators and content and communications service providers.  Among Acacia's products are a series of low-power coherent digital signal processor application-specific integrated circuits ("DSP ASICs") and silicon photonic integrated circuits ("silicon PICs") integrated into families of optical interconnect modules with transmission speeds ranging from 100 to 400 gigabits per second, used in long-haul, metro, and inter-data center markets.  The sale of Acacia's products from its 100 and 400 billions of bits per second ("Gbps") product families generates substantially all of the Company's revenue.

102.    The Company's products are sold in North and South America, Europe, Asia, the Middle East, and Africa, and the vast majority of its products are sold to network equipment manufacturers for ultimate sale to communications and content service providers and data center and cloud infrastructure operators, which the Company refers to together as cloud and service providers.  Network equipment manufacturer customers are anticipated by the Company to be the principal market for its products for at least the foreseeable future.

103.    The Company's customers can take long periods of time to determine what products they want to purchase from Acacia since the Company does not allow product returns after sale.  As noted by the Company in its May 9, 2017 Form 10-Q filed with the SEC, "[c]ustomer orders are complex and difficult to complete because prospective customers generally consider a number of factors over an extended period of time before committing to purchase the products [the Company] sell[s]."  Moreover, "[c]ustomers often view the purchase of our products as a significant and strategic decision and require considerable time to evaluate, test and qualify [the Company's] products prior to making a purchase decision and placing an order."

104.    With regard to the Company's product revenue, the Company's February 23, 2017 Form 10-K filed with the SEC notes that Acacia's "product revenue is typically characterized by a life cycle that begins with sales of pre-production samples and prototypes followed by the sale of early production models with higher average selling prices and lower volumes, followed by broader market adoption, higher volumes, and average selling prices that are lower than initial levels."   The Company also notes that its product revenue can be impacted "by contractual commitments to significant customers that obligate us to reduce the selling price of our products on an annual or semi-annual basis."

105.    The Company's products, when shipped, do not require modification, production, or customization, and are purported to be fully functional.  Revenue from the sale of its products is only recognized by the Company "when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collection is reasonably assured."

106.    In light of these factors, the sales cycle of the Company can be long.  However, the long sales cycle can provide the Company with considerable foresight into customer demand for its products and future sales to customers.

107.    On May 18, 2016, the Company completed its IPO -- in which it issued and sold 4,570,184 shares of common stock for a price per share to the public of $23.00.   Certain stockholders of the Company, including several of the Individual Defendants, sold an additional 604,816 shares in the IPO.  Acacia received aggregate proceeds of approximately $97.8 million from the IPO, net of underwriters' discounts and commissions.

108.    During the Relevant Period, on October 13, 2016, the Company completed the FPO – in which it issued and sold 1,210,302 shares of common stock for a price per share to the public of ***$100.00***.  Certain stockholders of the Company, including several of the Individual Defendants,

sold an additional 3,289,698 shares in the FPO. Acacia received aggregate proceeds of $116.8 million from the FPO, net of underwriters' discounts and commissions. The selling stockholders who are Individual Defendants or are controlled by one of the Individual Defendants received approximately $220 million in aggregate proceeds from the FPO.

**Issues with the Company's Important Customers During the Relevant Period**

109.   On October 27, 2016, one of the Company's largest clients, ZTE, reported disappointing sales for the quarter ended September 30, 2016, and announced even worse sales guidance for future periods. ZTE accounted for approximately 38% of the Company's sales during the first half of 2016. ZTE's weak sales guidance resulted, at least in part, from lessened demand for ZTE's 4G telecom infrastructure in China as major carriers had completed their network coverage there.

110.   Also on October 27, 2016, ADVA, which accounted for 24% of the Company's revenue in the first half of 2016, announced weak guidance for the upcoming quarter ended December 31, 2016, noting that ADVA had fallen three months behind in rolling out its CloudConnect product, which utilized Acacia's 400 gigabit coherent module.

111.   On April 25, 2017, MACOM Technology Solutions Holdings, Inc. ("MACOM"), a competitor of Acacia, provided soft financial guidance for the quarter ended June 30, 2017, citing inventory correction issues and a near-term demand slowdown in China, a market that ZTE worked in and was thus responsible for a significant portion of Acacia's revenue. MACOM held an earnings call the same day, where its CEO cited weakness and headwinds in the market Acacia was also conducting business in, stating, in relevant part:

> I would say the one thing that we want to be very clear about and I think I was emphatic is there is no question that there is a cyclical weakness on the carrier-based side of the business. . . . [Y]ou have got the China correction happening with the Metro/Long Haul provincial deployments so there is no question that there

is some headwinds in demand.  . . .  [I]f we didn't have those headwinds in China I think things would be materially stronger.

112.    On this news, the price of MACOM common stock declined by over $3.50 per share on April 26, 2017.  The news also dragged down the stock prices of Acacia and MACOM's competitors, including Lumentum Holdings Inc. ("Lumentum"), Oclaro, Inc. ("Oclaro"), NeoPhotonics Corporation ("NeoPhotonics"), and Inphi Corporation ("Inphi").    Acacia, specifically, experienced a $6.05, or 11%, drop from the previous day's closing price per share to close at $48.08 per share on April 26, 2017.

113.    Due to first quarter 2017 earnings commentary provided by several optical vendors including MACOM, Inphi, Oclaro, Lumentum, and NeoPhotonics, a stock analyst at William Blair, Dmitry Netis ("Netis"), cut the firm's estimates on Acacia on May 8, 2017.  MACOM, Inphi, Oclaro, Lumentum, and NeoPhotonics each provided underwhelming projections for the second fiscal quarter ended June 30, 2017, and cited inventory correction issues and near-term demand slowdown in China.  Per Netis' report, the "weakness in most cases was attributed to Huawei,[3]" but "Oclaro noted its business at ZTE ha[d] been affected as well."  Netis also noted that "Acacia derived 41% of revenue from China in 2016 and ZTE represented 32% of total revenue," and provided further explanation for the lowered estimates, stating, in relevant part:

> Amid fears that this inventory correction issue could continue throughout the later part of the second half 2017 and the new Phase 12 and 13 China tenders awards will not affect results meaningfully until the fourth quarter – e.g., Oclaro management noted it has no visibility into the June or September time frame –we are lowering our estimates to derisk the model. In addition, our conversations with ADVA –Acacia's second-largest customer, which accounted for 21% of revenue last quarter – highlight an ongoing inventory correction issue as the company is transitioning customers to new platforms.

---

[3] "Huawei," or Huawei Technologies Co. Ltd, is a Chinese multinational networking and telecommunications equipment and services company.

114.    On this news, the price per share of Acacia common stock fell $0.67, or 1.4%, from the closing price on the previous day the market was open to close at $46.85 per share on May 8, 2017.

115.    Item 303 of Regulation S-K (17 C.F.R. § 229.303) requires issuers to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  Thus, in the FPO Registration Statement, the Company was required to disclose that at the time of the FPO, Acacia's sales to ADVA and ZTE, its two top customers, were declining as a result of operational issues specific to those companies.  Moreover, the Company was required to disclose that there were quality issues concerning the manufacture of ZTE's products, which Acacia would be responsible for remediating.

116.    Despite the announcements made during the Relevant Period by two of the Company's most important customers, analysts, and the Company's competitors, which provided financial results and noteworthy events that negatively impacted Acacia's financial results, the Individual Defendants failed to disclose the whole truth and made and caused the Company to make the false and misleading statements discussed further herein.

117.    Such uncertainties and adverse events relating to the declining trends experienced by the Company during the Relevant Period were more than reasonably likely to have a material impact on the Company's financial results, and thus were required to be disclosed in the FPO Registration Statement.  The Company, however, instead provided a false and misleading portrayal of Acacia's business by failing to make these and other disclosures in the FPO Registration Statement and its other SEC filings, press releases, and earnings calls as discussed further herein, including those leading up to the FPO, which had the effect of artificially inflating the price of the Company's stock.

**False and Misleading Statements**

### *August 11, 2016 10-Q, Press Release, and Earnings Call*

118.    On August 11, 2016, the Company issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2016, and providing positive guidance for the next quarter.  Specifically, the press release announced that the Company achieved "[r]evenue of $116.2 million, increased 101% year-over-year," and "Net Income up 274% year-over year." Defendant Shamugaraj commented positively on the Company's results, stating, in relevant part:

> Our record second quarter results exceeded our expectations across the board and reflect the success of our disruptive technology in transforming cloud, content and communications networks.  These results are a testament to our strategy and demonstrate our leadership position in the high-growth 100G plus optical networking market . . . We continue to see strong global demand for our products, driven by metro and inter-data center network infrastructure buildouts.

119.    In the press release, Defendant Gavin noted "excite[ment] about the many opportunities ahead," stating, in relevant part:

> We are delighted to have completed our IPO during the second quarter and are excited about the many opportunities ahead of us . . . The IPO enabled us to strengthen Acacia Communications' balance sheet while providing substantial capacity to further grow the business.

120.    The Company additionally provided the following guidance in the press release for the third fiscal quarter ended September 30, 2016: Revenue (millions)—$120.0 to $128.0; Non-GAAP Net Income (millions)—$26.0 to $31.0; and Non-GAAP Diluted Earnings Per Share--$0.64 to $0.76.

121.    Also on August 11, 2016, the Company filed a Form 10-Q with the SEC for the second fiscal quarter ended June 30, 2016 (the "2Q 2016 10-Q"), signed by Defendant Shanmugaraj, reaffirming financial results presented in the August 11, 2016 press release.

122.    Attached to the 2Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Shanmugaraj and Gavin attesting to the accuracy of the 2Q 2016 10-Q.

123.    Acacia also held an earnings call on August 11, 2016, discussing the Company's second quarter 2016 results and prospects.   During the earnings call, Defendant Shanmugaraj glowingly portrayed the Company's customer base growth, stating, in relevant part:

> The market opportunity we are targeting is large and growing. The growth in bandwidth demand has caused an increase in investments across long-haul, metro and inter-data center networks with most of that investment focused on speeds up 100G and higher. With the growth of large data centers and content moving closer to the consumer, we are seeing strong demand for our products across metro and inter-data center networks.
>
> Geographically, we are seeing demand across all regions while demand from China is particularly strong. Our customer base has grown from eight customers in 2011 to more than 25 customers in the first half of 2016. We have seen substantial increases in customer revenue in the past four years from our original eight customers. They have increased both the volume and the number of products they purchased from us. And we believe, we will see similar increases from our newer customers going forward.

124.    Defendant Shanmugaraj commented further on the Company's growth and how similar growth was expected to continue into the second half of 2016, stating, in relevant part:

> Our growth is being driven by strong global demand from metro and inter-data center network buildouts. We believe that the industry is in the early stages of a multi-year buildout cycle of 100G, 200G and 400G technology. These buildouts are happening in long-haul including submarine and in metro and inter-data center networks.
>
> In the second quarter, we saw a step function increase in demand driven by deployments in all of our growth markets. We started to see this demand increase beginning late in the first quarter and continuing into the second quarter which enabled us to achieve a revenue growth rate of 91% year-over-year in the first half of 2016. We expect similar growth to continue into the second half of 2016.

125.    During the earnings call, Defendant Gavin also commented on the Company's growth, stating, in relevant part:

> Total revenue of $116.2 million for the second quarter of 2016 rose 101% from revenue of $57.9 million in the second quarter of 2015. This growth was driven by continued strong global demand for metro and inter-data center network buildouts with particularly strong demand from the China market.

126.    The Company's August 11, 2016 announcements led to a $27.97, or 41%, increase in the price per share of the Company's stock, which ultimately closed at $95.67 per share on August 12, 2016.

127.    The Company's August 11, 2016 announcements additionally elicited positive reaction by analysts.  For example, on August 12, 2016, a Deutsche Bank analyst issued a report titled "Solid Beat and Raise Results," giving Acacia's stock a "buy" designation, and stated, in relevant part:

**Beat and Raise Story; Reiterate Buy; Raise PT: $60 to $90**

Solid Q2 beat and raise: $116.2M/77c versus consensus: $85.8M (consensus EPS numbers are not comparable), and the Q3 guide: $120-128M/64-76c versus consensus: $91.7M. The top-line beat was driven by strong global demand for [Acacia's] 100G and 400G Optical modules in Metro and Cloud Datacenter Interconnects. We are bullish on [Acacia's] "disruptive" Optical Networking Growth Story - a +$4-5B Silicon Optical opportunity [DB view]. Our midterm view calls for +30% topline CAGR, high 40s gross margin, low 20s operating margin. We raise our PT from $60 to $90. Reiterate BUY.

128.    Analysts from Cowen and Company also issued a report on August 12, 2016, titled "2Q16: Comes Out of the Gate Firing On All Cylinders," which significantly increased estimates for Acacia, and stated, in relevant part:

2Q16 operating results bolster our investment outlook: [Acacia] represents an exceptional company addressing a significant 100G+ optical upgrade cycle (fueled by Metro, DCI and China), which should continue to drive impressive growth and operating profitability. We are significantly raising our operating forecasts and price target and reiterate our Outperform rating.

**Significantly Increasing Estimates Off of Significant Beat and Raise**

We have significantly increased our operating forecasts and price target in the wake of [Acacia's] 2Q16 extraordinary results and outlook. We have increased our CY16, 17 and 18 revenue forecasts by over $100M in each year and PF EPS estimates by $1.14, $0.83 and $0.32, respectively. 2Q16 $116.1M revenue and $0.77 EPS was ~ $30 mln (or 35+%) and over $0.46 (or ~ 150%) above our $86.3M/$0.31 and Street consensus's $85.8M/$0.30 estimates. The significantly higher revenue (35+%) together with significantly higher GM (~4 pp) drove the

150% EPS upside relative to our and consensus's estimates. In addition, [Acacia] posted opex over $2M below consensus's estimate. Similarly, [Acacia's] $120 – 128M 3Q16 rev and $0.64 – 0.76 PF EPS guidance each significantly exceeded our $91.6M/$0.43 and consensus's $90.7M/$0.42 previous estimates – at the midpoint by over $32 mln (or 35%) and $0.27 (or ~ 65%), respectively. Alternatively viewed: reported 2Q16 EPS exceeded our EPS forecast for 2Q16 + 3Q16. Strong growth in backlog, lead times of 9 - 10 weeks on the low end to as much as 13 – 15 weeks on the higher end, and some degree of supply constraint provides good visibility.

### *September 26, 2016 Form 8-K*

129.    On September 26, 2016, the Company filed a Form 8-K with the SEC, providing Acacia's "Unaudited Financial Outlook for the Third Quarter of 2016," and in which the Company raised its revenue guidance for the fiscal quarter ended September 30, 2016, stating, in relevant part:

> Based on preliminary unaudited information and estimates of the management of Acacia Communications, Inc. (the "Company") for the three months ending September 30, 2016, and subject to the completion of the 2016 third quarter and its financial closing procedures, in the three months ending September 30, 2016, the Company expects revenue of $127 million to $131 million, GAAP net income of $23 million to $27 million, non-GAAP net income of $29 million to $33 million, GAAP diluted earnings per share of $0.58 to $0.67 and non-GAAP diluted earnings per share of $0.72 to $0.81.

### *The FPO Registration Statement*

130.    On September 26, 2016, the Company filed a Form S-1 for the FPO with the SEC, which was amended on Form S-1/A on October 4, 2016, and signed by Defendants Shanmugaraj, Gavin, Murphy, Swanson, Chung, Mikkelsen, Reiss, Ritchie, and Roche, and declared effective on October 6, 2016.   On October 7, 2016, the Company filed its final prospectus on Form 424B4 for the FPO (collectively with the Form S-1 and Form S-1/A, the "FPO Registration Statement"). The FPO Registration Statement commented on the quality of the Company's products, stating that the "advanced software in [the Company's] modules enables increased configurability and automation, provides insight into network and connection point characteristics and helps identify

network performance problems, all of which increase flexibility and reduce operating costs." Moreover, the FPO Registration Statement noted that "[t]hrough the use of standard interfaces, [the Company's] modules can be easily integrated with customers' network equipment."

131.    The FPO Registration Statement commented on the Company's growth strategy generally, stating, in relevant part:

**Our Growth Strategy**

Our goal is to become the leading provider of high-speed optical interconnect technology that underpins the world's data and communication networks. To grow our business and achieve our vision, we are pursuing the following strategies:

\* \* \*

Increase penetration within our existing customer base. As we continue to enhance and expand our product families, and as our existing customers seek to expand and improve their network equipment technology, we expect to generate additional revenue through sales to these customers.

\* \* \*

Our revenue has generally increased over the periods presented due to increased demand for products in our 100 Gbps product family, as well as the introduction of new products in our 400 Gbps product family. In 2014, we experienced a decline in revenue in the fourth quarter compared to the third quarter due to our customers' ability to delay or reschedule shipments under the terms of their contracts with us, resulting in $4.0 million of anticipated purchases by two customers being delayed to the first quarter of 2015.

132.    The FPO Registration Statement also noted growing demand for network capacity and bandwidth, stating, in relevant part:

***Growing Demand for Bandwidth and Network Capacity***

Global Internet protocol, or IP, traffic is projected to nearly triple from 2.4 exabytes per day in 2015 to 6.4 exabytes per day in 2020, representing a 22% compound annual growth rate, or CAGR, according to Cisco's Visual Networking Index Complete Forecast Highlights Report, dated June 2016, or the VNI Report. This rapid growth in IP traffic is the result of several factors, including:

- ***Increased data and video consumption.***   Over the last decade, the proliferation of new technologies, applications, Web 2.0-based services and Internet-connected devices has led to increasing levels of Internet traffic and congestion and the need for greater bandwidth. Video traffic, in particular, is growing rapidly, and placing significant strains on network capacity. The VNI Report estimates that video traffic will represent 82% of all global IP traffic in 2020, reaching 158.9 exabytes per month, up from 51.0 exabytes per month in 2015.

- ***Growth in mobile and 4G/LTE communications.***   The increasing demand for data- and video-intensive content and applications on mobile devices is driving significant growth in mobile data and video traffic and has led to the proliferation of advanced wireless communication technologies, such as 4G/LTE, which depend on wired networks to function. According to Cisco's Visual Networking Index: Global Mobile Data Traffic Forecast Update, 2015-2020 White Paper, dated February 2016, global mobile data traffic grew 74% in 2015 from the prior year and is expected to increase nearly eight-fold from 2015 to 2020, a 53% compound annual growth rate.

- ***Proliferation of cloud services.***   Enterprises are increasingly adopting cloud services to reduce IT costs and enable more flexible operating models. Consumers are increasingly relying on cloud services to satisfy video, audio and photo storage and sharing needs. Together, these factors are driving increased Internet traffic as cloud services are accessed and used. Daily global cloud traffic is expected to quadruple from 5.8 exabytes in 2014 to 23.6 exabytes in 2019, according to the Cisco Global Cloud Index, dated October 2015. Forrester Research, in its report on Public Cloud Markets, released in September 2016, forecasts that the public cloud market will reach $236 billion by 2020, growing at a CAGR of 22% between 2015 and 2020.

- ***Changing traffic patterns.***   Content service providers and data center operators are increasingly building their own networks of connected data centers to handle increasing amounts of data. The architectures of these connected data centers dramatically increase the amount of data being transmitted within these data center networks. For example, Facebook found that a single 1 kB data inquiry generated 930 kB of traffic within its private data center network as reported in Facebook's Data Center Network Architecture, abstract from the proceedings of the IEEE Optical Interconnects Conference, published in May 2013.

- ***Adoption of the "Internet of Things."***   Significant consumer, enterprise and governmental adoption of the "Internet of Things," which refers to the global network of Internet-connected devices embedded with electronics, software and sensors, is anticipated to strain network capacity further and increase demand for bandwidth. The VNI Report estimates that 26.3 billion

devices and objects will be connected to the Internet by 2020, compared to 16.3 billion in 2015.

133.    The demand for the Company's products was touted further in the FPO Registration Statement, which stated that the Company "experienced rapid revenue growth over the last several years."   The FPO Registration Statement also touted the purportedly strong demand for the Company products by providing revenue figures, stating that "revenue for 2015 was $239.1 million, a 63.5% increase from $146.2 million of revenue in 2014," and that "revenue for the six months ended June 30, 2016 was $200.7 million, a 91% increase from $105.1 million of revenue in the six months ended June 30, 2015."   Moreover, for the third quarter 2016, the FBO Registration Statement noted that the Company expected "revenue of $130 million to $133 million," significantly greater than the $65.4 million reported in the same quarter of 2015.

134.    In providing the reasons for the Company's revenue growth, the FPO Registration Statement noted that "revenue has generally increased due to increased demand for products in our 100 Gbps product family, as well as the introduction of new products in our 400 Gbps product family."   The FPO Registration Statement additionally noted that "[a]s [Acacia] continue[s] to enhance and expand our product families, and as our existing customers seek to expand and improve their network equipment technology, we expect to generate additional revenue through sales to these customers."

135.    Additionally, the FPO Registration Statement specifically discussed the manufacturing and design of the Company's products, stating, in relevant part:

> Our modules are rooted in our low-power coherent DSP ASICs and/or silicon PICs, which we have specifically developed for our target markets. Our coherent DSP ASICs are manufactured using complementary metal oxide semiconductor, or CMOS, and our silicon PICs are manufactured using a CMOS-compatible process. CMOS is a widely-used and cost-effective semiconductor process technology. Using CMOS to siliconize optical interconnect technology enables us to continue to integrate increasing functionality into our products, benefit from

higher yields and reliability associated with CMOS and capitalize on regular improvements in CMOS performance, density and cost. Our use of CMOS also enables us to use outsourced foundry services rather than requiring custom fabrication to manufacture our products. In addition, our use of CMOS and CMOS compatible processes enables us to take advantage of the major investments in manufacturing and the technology and integration improvements driven by other computer and communications markets that rely on CMOS.

Our engineering and management teams have extensive experience in optical systems and networking, digital signal processing, large-scale ASIC design and verification, silicon photonic integration, system software development, hardware design and high-speed electronics design. This broad expertise in a range of advanced technologies, methodologies and processes enhances our innovation, design and development capabilities and has enabled us to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009. Our sixth coherent DSP ASIC is currently under development and anticipated to be introduced in the fourth quarter of 2016. In the course of our product development cycles, we continuously engage with our customers as they design their current and next-generation network equipment, which provides us with insights into current and future market needs.

136.   According to the FPO Registration Statement, one of the Company's "Competitive Strengths" was its "[t]rack record of rapid innovation driven by advanced design methodologies," and that Company's "broad expertise in a range of advanced technologies, methodologies and processes enhances [its] innovation, design and development capabilities and has enabled [Acacia] to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009."  Moreover, the FPO Registration stated as "Competitive Strengths" the Company's "[c]ustomer collaboration provid[ing] deep understanding of market needs," and that the Company "collaborate[s] closely with our customers, as well as directly with many cloud and service providers, which allows us to better understand their needs and anticipate next generation product and service requirements."

137.   The FPO Registration Statement also noted the Company's continuous engagement with its customers during product development, stating, in relevant part, "In the course of our product development cycles, we continuously engage with our customers as they design their

current and next-generation network equipment, which provides us with deep insights into the current and future market needs."

138.    The Company's manufacturing was also discussed in the FPO Registration Statement, stating that Acacia contracts and works closely with certain third-party contract manufacturers, and that it requires these third-parties to meet high quality and reliability standards. The FPO Registration Statement noted, in relevant part:

> We contract with third parties to manufacture, assemble and test our products. We utilize a range of [complementary metal oxide semiconductor ("CMOS")] and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products. For several of our products, a single foundry fab is selected for semiconductor wafer production.
>
> We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules. Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. We build the test systems used by our contract manufacturers. We also directly manufacture prototype products and limited production quantities during initial new product introduction.
>
> We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly.
>
> We subject our third-party manufacturing contractors and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.

**<u>The Truth Slowly Begins to Emerge</u>**

***October 27, 2016 Announcements of Soft Guidance for ZTE and ADVA***

139.    On October 27, 2016, just two weeks after several of the Individual Defendants dumped millions of Company shares for proceeds of about $220 million in the FPO, ZTE and ADVA both reported soft guidance.   ZTE, which was the Company's largest customer and accounted for approximately 40% of its sales during the first six months of 2016, reported 23.8 billion yuan in revenue for the third quarter, well below market analysts' consensus estimate of 26.27 billion yuan for the same period, noting pressures from a weak global macroeconomy impacted the telecommunications industry in the past three quarters.   ADVA, the Company's second-largest customer, provided fourth-quarter revenue guidance of 125 million euros to 140 million euros, far below the consensus estimate of 149 million euros.   ADVA moreover disclosed that it had fallen about three months behind in rolling out a project that utilized Acacia's products.

### November 10, 2016 Form 10-Q and Press Release

140.    On November 10, 2016, the Company issued a press release announcing its financial results for the fiscal quarter ended September 30, 2016, specifically reporting "Revenue of $135.3 million up 107% and Net Income up 295% year-over-year."   Defendant Shanmugaraj stated in the press release that the "results exceeded our expectations," stating, in relevant part:

> Our third quarter results exceeded our expectations driven by strong global demand for our products across metro and inter-data center networks . . . .  To satisfy this continued demand, we further scaled our manufacturing capacity during the quarter. As was the case in the second quarter, we continued to diversify our revenue base, with two of our newer top tier customers ranking among the top five contributors to our revenue in the third quarter. Additionally, we recently announced sampling of our coherent CFP2-DCO module, leveraging our sixth DSP ASIC developed in 16nm CMOS, which we believe demonstrates our continued technology leadership position.

141.    Defendant Gavin also commented positively on the quarterly results, stating, in relevant part:

> We are pleased that the continued market success of our highly-integrated product portfolio, combined with our ability to increase production capacity, led to

enhanced profitability during the third quarter . . . .   We are also pleased to have completed our follow-on offering last month, which strengthened our balance sheet and provides us with financial flexibility to pursue our growth objectives and expand our product offerings.

142.    The Company additionally provided the following guidance in the press release for the fourth fiscal quarter ended December 31, 2016: Revenue (millions)—$136.0 to $141.0; Non-GAAP Net Income (millions)—$36.0 to $39.0; and Non-GAAP Diluted Earnings Per Share—$0.85 to $0.92.

143.    Also on November 10, 2016, the Company filed a Form 10-Q with the SEC for the third fiscal quarter (the "3Q 2016 10-Q"), signed by Defendant Shanmugaraj, reaffirming financial results presented in the November 10, 2016 press release.

144.    Attached to the 3Q 2016 10-Q were SOX Certifications signed by Defendants Shanmugaraj and Gavin, attesting to the accuracy of the 3Q 2016 10-Q.

145.    The Company also held an earnings call on November 10, 2016 – in which Defendants Shanmugaraj and Gavin downplayed the negative impact of the soft guidance provided by ZTE and ADVA.  In the following exchange with an analyst in which they were asked about the "customer concentration issue," Defendants Shanmugaraj and Gavin suggested that growth from the Company's smaller customers would make up for the ADVA and ZTE declines:

[Analyst]

Thanks for taking my questions. The first one I want to touch on is actually a bit of the customer concentration issues as well. And the 10-Q is out, so we can get a pretty detailed look at what those customers are.

And what strikes me and what I want to get your response on is the three big customers that have been that way for the past few quarters were still 69% of sales, which is basically the same that it has been for the past two quarters during the year as well. So I'm wondering if you can give a little bit more detail onto that diversification.

And then related to two out of those three big customers, one already guided for pretty significant sequential declines in the fourth quarter. So I'm wondering as we look in the fourth quarter, should we really see a material ramp-up in the new customer revenue contributions to offset some of those potential declines?

[Defendant Shanmugaraj]

Yes, so good question. Let me take a crack at it, Doug, and maybe John can chime in. As we said, the customer concentration, while there is not an addition of another 10% customer, we made two references. One is that we have added two top-tier customers into our top five, which was not the case before. It was in Q2, but not before that. So we are happy with the ramp of our top-tier customers.

Number two is these are 18- to 24-month lead time development. So in other words, it is not something that we take in and they plug in like a client side and off to market they go within a couple of months.

These are 18 to 24. We -- they have to develop their product, integrate our product, then qualify our product and take it to their customers, qualify in their customers. So it is a -- it takes time. And that is the other piece of it.

So while we don't have a new 10% customer, we have 2 of those in the top five. And also, as I said in my section, the new customers accounted for 37% sequential growth quarter over quarter. And we see that growth continuing, which is also what – the point I made about the -- to offset some of the seasonality.

So it will take time at this point, and at the right time, obviously, we will share with you as soon as the customer crosses that 10% threshold. But the way to look at it as we have several of these that are not at the 10% level, but we're very happy with the progress of our newer customers.

[Defendant Gavin]

And Doug, I will just add to that. As I said in my prepared remarks, 25% of our revenue in Q3 was from that new customer set. It's the highest percent contribution of that group to date. And we expect that to grow again in Q4 and through the quarters starting in 2017. So we are seeing that start to ramp up, and we just had some customers in Q3 from the original customer group that had large quarter for them in Q3.

* * *

[Defendant Shanmugaraj]

And again, the part B question was about what about the customers who guided, and I think I covered a little bit of that earlier. One is that a customer like ZTE, for

example, has all the way from mobile to handset to optical.

So is very hard. We don't see any slowdown in the 100G and about optical segment from a customer like ZTE, for example. So just because they claim they've guided some number, which we can't really comment on. What we can say is that we don't see any slowdown in that ramp. And of course, it is being offset, as we talk about, with the new customers ramping up as well.

### *February 23, 2017 Form 10-K and Press Release*

146.    On February 23, 2017, the Company issued a press release announcing its financial results for the fiscal quarter and year ended December 31, 2016 and providing positive guidance for the next quarter.  Specifically, the press release announced that the Company achieved "Fourth quarter revenue of $142.4 million up 108% and GAAP net income up 185% year-over-year."

147.    The Company additionally provided the following guidance in the press release for the first fiscal quarter ended March 31, 2017: Revenue (millions)—$108.0 to $114.0; Non-GAAP Net Income (millions)—$27.0 to $30.0; and Non-GAAP Diluted Earnings Per Share—$0.63 to $0.70.  This guidance, however, was significantly lower than the guidance it had provided in the previous fiscal quarter, and signaled that the Company expected that it would actually do worse in the forthcoming quarter.

148.    In an attempt to combat the expectedly negative market reaction, Defendant Shanmugaraj commented positively on the Company's fourth quarter results, stating, in relevant part:

Our solid fourth quarter results were driven by continued strong global demand for our 100G and flex-400G products from the metro and DCI markets and the ramp of our newer customers, and we are very pleased to report that we added a hyper-scale cloud and content provider, who is a direct customer deploying our AC400 product, as a significant customer in the fourth quarter . . . .  We are committed to our mission of delivering high-speed optical interconnects that transform cloud, content and communication networks.  We are already seeing good traction with our latest "industry first" product, the CFP2-DCO module, and we believe that our current product offerings, roadmap products, and development pipeline, position us well to take advantage of future growth opportunities.

149.    Defendant Gavin also touted the Company's "strong year," stating, in relevant part:

Our fourth quarter results again exceeded our guidance for revenue and non-GAAP diluted EPS[] and capped off a strong year at **Acacia Communications**. During the fourth quarter, we experienced year-over-year revenue growth of 108%, further diversified our revenue base, with sales to newer customers outside our original eight 2011 customers increasing to 35% of our total revenue from 14% in the first quarter of 2016 . . . .  We believe our market strategy and business model are strong, and position us for further growth.

150.    Also on February 23, 2017, the Company filed a Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2016 (the "2016 10-K"), signed by Defendants Shanmugaraj, Gavin, Swanson, Chung, Mikkelsen, Reiss, Ritchie, and Roche, reaffirming financial results presented in the February 23, 2017 press release.

151.    The 2016 10-K additionally assured the investing public that Acacia's third-party contract manufacturers and foundries were subject to special requirements to meet the purported "high quality and reliability standards required of [Acacia's] products," stating, in relevant part:

**Manufacturing**

We contract with third parties to manufacture, assemble and test our products. We utilize a range of CMOS and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products.

We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules. Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. We build the test systems used by our contract manufacturers. We also directly manufacture prototype products and limited production quantities during initial new product introduction.

We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and

administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly.

We subject our third-party contract manufacturers and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.

152.    Attached to the 2016 10-K were SOX Certifications signed by Defendants Shanmugaraj and Gavin, attesting to the accuracy of the 2016 10-K.

153.    The Company also held an earnings call on February 23, 2017 – in which Defendant Shanmugaraj attributed the lowered guidance for the first fiscal quarter of 2017 to declining orders from an unnamed key customer,[4] stating, in relevant part:

During the first quarter of 2017, we are seeing a lower than anticipated order rate from one of our larger customers with exposure to their DCI market. This customer has recently indicated that demand from their cloud and content provider customers is hard to predict given the smaller teams of those providers and their changing priorities. This customer's lower order rate is a major factor in how we formulated our first quarter guidance.

154.    As noted in a February 24, 2017 report published by *The Motley Fool*, the Company was "still highly dependent on a small group of customers, its revenue growth is becoming more volatile as it becomes larger" and "[t]he days of extremely rapid growth appear to be over for now." Further, the report stated that "[i]nvestors didn't take the news well, sending the stock plunging on Friday."

155.    In fact, on this news, the price per share of Acacia common stock fell $9.39, or over 14%, from the previous day's closing price to close at $54.04 per share on February 24, 2017.

---

[4] Regarding this unnamed customer, SmarterAnalyst "note[s] with high degree of certainty [it] is ADVA." *Analysts Weigh In on Two Volatile Stocks: Acacia Communications, Inc. (ACIA) and RH (RH)*, Julie Lamb, SMARTERANALYST, found at: https://www.smarteranalyst.com/2017/02/24/analysts-weigh-two-volatile-stocks-acacia-communications-inc-acia-rh-rh/ (last accessed September 28, 2017).

*April 6, 2017 Proxy Statement*

156.    On April 6, 2017, the Company filed the 2017 Proxy Statement with the SEC.  The 2017 Proxy Statement failed to disclose that: (1) prior to and during the FPO, the Company was experiencing declining demand for its products from their top two customers, who had experienced sales and operational issues in the quarter ended September 30, 2016, limiting their demand for the Company's products; (2) the Company had manufacturing issues, causing a disruption in the manufacturing, supply, and sales of its products, and thus Company revenues; (3) a substantial portion of Acacia's sales growth prior to its FPO was due to projects that were practically complete or winding down, including China's 4G infrastructure buildout in a vital market, and shrinking demand for the Company's products; (4) ADVA was experiencing issues rolling out its own cloud-based technology using the Company's products, resulting in a reduction in its demand for the Company's products; (5) the Company had quality issues that affected a portion of the units manufactured by one of the Company's three contract manufacturers, caused by a former circuit board cleaning process used by the Company; (6) Acacia was suffering from its attempts to remediate the quality issues while also meeting current demand for the Company's products; and (7) the Company failed to maintain internal controls.

157.    Moreover, due to the Individual Defendants' violations of the Code of Conduct, the 2017 Proxy Statement was false and misleading in representing that Acacia adopted the Code of Conduct, and that it applied to Acacia's officers, directors, and employees.

158.    The 2017 Proxy Statement also falsely and misleadingly suggested that adequate internal control, compliance, disclosure review, and reporting programs were maintained by the Board to mitigate misconduct and to apprise the Board of any significant risks.  Moreover, the 2017 Proxy Statement suggested that the Audit Committee adequately reviewed Acacia's financial

statements and disclosures, and monitored disclosure and internal controls to ensure that they were effective.  While the 2017 Proxy Statement provided information regarding the aggregate proceeds garnered by certain Individual Defendants in the FPO, it failed to disclose that several of the Individual Defendants, including Defendants Shanmugaraj and Mikkelsen who were being voted on for re-election, had made sales of personally held Company stock while the price per share of Company stock was artificially inflated due to the false and misleading statements discussed herein and while they were in possession of non-public, material, adverse information.

159.    The 2017 Proxy Statement stated, in relevant part:

**Audit Committee**

Our Audit Committee's responsibilities include:

\* \* \*

- reviewing and discussing with management and the registered public accounting firm our annual and quarterly financial statements and related disclosures;

- monitoring our internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics;

\* \* \*

**Board Processes**

**Oversight of Risk**

Our Board of Directors oversees our risk management processes directly and through its Committees. Our management is responsible for risk management on a day-to-day basis. The role of our Board and its committees is to oversee the risk management activities of our management. They fulfill this duty by discussing with management the policies and practices utilized by management in assessing and managing risks and providing input on those policies and practices. In general, our Board oversees risk management activities relating to business strategy, acquisitions, capital allocation, organizational structure and certain operational risks; our Audit Committee oversees risk management activities related to financial controls and legal and compliance risks; our Nominating and Corporate Governance Committee oversees risk management activities relating to the

composition of our Board; and our Compensation Committee oversees risk management activities relating to our compensation policies and practices and management succession planning. Each Committee reports to the full Board on a regular basis, including reports with respect to each Committee's risk oversight activities as appropriate. In addition, since risk issues often overlap, Committees from time to time request that the full Board discuss particular risks.

### *Participation in our Follow-On Public Offering*

On October 13, 2016, we closed our follow-on public offering in which we issued and sold 1,210,302 shares of common stock and certain selling stockholders sold an additional 3,289,698 shares.  The price per share to the public was $100.00, resulting in aggregate proceeds to the company of approximately $116.8 million, net of underwriters' discounts and commissions, before deduction of offering expenses of approximately $1.2 million. The selling stockholders in our follow-on public offering included each of our executive officers, entities affiliated with Summit Partners, L.P., Commonwealth Capital Ventures and Matrix Partners and certain of our directors as set forth in the table below.  We did not receive any proceeds from the sale of shares by the selling stockholders.

160.    With regard to the re-election of Defendants Shanmugaraj and Mikkelsen to the Board, the 2017 Proxy Statement stated, in relevant part:

### Nominees

Based on the recommendation of the Nominating and Corporate Governance Committee of our Board of Directors ("Nominating and Corporate Governance Committee"), our Board of Directors has nominated Murugesan Shanmugaraj and Benny P. Mikkelsen for election as directors to serve for a three-year term ending at the 2020 annual meeting or until their successors are elected and qualified. Each of the nominees is a current member of our Board of Directors and has consented to serve if elected.

### *April 25, 2017 Reports of Weak Demand in Acacia's Market*

161.    On April 25, 2017, news began to be released indicating that demand was weakening in the market the Company serviced.  MACOM issued poor financial guidance for the following quarter, noting demand slowdown in China and various inventory correction issues. During a conference call the same day, the CEO of MACOM was "emphatic" that "there [was] no question that there [was] a cyclical weakness on the carrier base side of the business," that the market had "the China correction happening with the Metro/Long Haul provincial deployments,

so there's no question that there [are] some headwinds in demand," and "if [the market] didn't have those headwinds in China, I think things would be materially stronger."

162.    On this news, the price per share of Acacia stock fell $6.05, or 11%, from the previous day's closing price to close at $48.08 on April 26, 2017.  The same day, MACOM's stock price fell along with that of several other Company competitors including NeoPhotonics Corporation, Inphi Corporation, and Lumentum Holdings Inc.

### May 9, 2017 Form 10-Q and Press Release

163.    On May 9, 2017, the Company issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2017, and providing positive guidance for the next quarter.  Specifically, the press release announced that the Company achieved "Revenue of $114.7 million up 36% and GAAP net income up 145% year-over-year."

164.    However, in the press release, the Company announced disappointing guidance for the following quarter that was markedly worse than the guidance it had just provided the quarter prior, specifically forecasting for the second fiscal quarter ended June 30, 2017: Revenue (millions)—$85.0 to $95.0; Non-GAAP Net Income (millions)—$10.0 to $15.0; and Non-GAAP Diluted Earnings Per Share—$0.22 to $0.35.

165.    Defendant Shanmugaraj nonetheless touted the Company's first quarter 2017 results, stating, in relevant part:

> We are pleased that our first quarter results came in stronger than we expected at the start of the quarter driven by demand for our CFP and flex-400G products around the world . . . .  During the quarter, we made good progress on ramping production of our CFP2-ACO and CFP2-DCO modules with our contract manufacturers and we continue to see strong customer interest for these products.  We believe that our continued innovation with products like our CFP2-DCO will further advance our technology leadership position and contribute to our growth in the second half of 2017 and beyond.

166.    Defendant Gavin touted the prospects of the Company in the press release, stating, in relevant part:

> We believe that our strong balance sheet, which shows a significant cash position and no debt, provides us with the financial flexibility to continue to invest in product development to further strengthen our competitive position and enable us to bring products to those markets that require a rapid pace of innovation, like the DCI market . . . .  For example, we recently announced our next generation Pico DSP ASIC which, when combined with our ball grid array PIC, will support transmission speeds of up to 1.2 Tbps with two carriers of 600 Gbps each.  Pico will power our AC1200 module and is focused on DCI applications.

167.    Also on May 9, 2017, the Company filed a Form 10-Q with the SEC for the third fiscal quarter (the "3Q 2016 10-Q"), signed by Defendant Shanmugaraj, reaffirming financial results presented in the May 9, 2017 press release.

168.    Attached to the 1Q 2017 10-Q were SOX Certifications signed by Defendants Shanmugaraj and Gavin, attesting to the accuracy of the 1Q 2017 10-Q.

169.    The Company also held an earnings call on May 9, 2017, and Defendant Shanmugaraj attributed blame for its disappointing guidance to softening demand from the China market, which he acknowledged the Company's stockholders were forced to learn of from its competitors, and variability in order rate from one customer, stating, in relevant part:

> I would now like to comment on our outlook for the second quarter of 2017. At the midpoint of our guidance range, we expect revenue to be sequentially down 21.7% from the first quarter due to a couple of factors. The primary factor is softening demand from the China market that started in April. As you may have heard from others in our industry, we're seeing what we believe to be a temporary slowdown in the deployments from carriers in China, causing our larger China customers to slow down their order rates in the second quarter. The secondary factor is the variability that we're seeing in the quarterly order rate from one of our direct hyperscale customers.
>
> We anticipate growth both in China and DCI markets, during the second half of 2017 compared to the first half of 2017. Our China customers tell us they anticipate conditions to improve in the third quarter of 2017. However, we believe the timing of a second half 2017 improvement will become clearer over the next few months.

> We believe the current slowdown in China is not a reflection of any weakening in the long term demand for 100G and above, rather a delayed deployment.

170.    On this news, the price per share of Acacia common stock fell $3.93, or over 8%, from the previous day's closing price to close at $44.48 per share on May 10, 2017.

### May 31, 2017 Press Release

171.    On May 31, 2017, the Company issued a press release disclosing that it had "identified a quality issue that [the Company] currently believes affects a portion of" its units, and that it was working with customers to remediate the issue.  Moreover, the press release noted that Acacia was working to estimate the cost of such remediation efforts and assess the impact of this issue on the Company's near-term manufacturing capacity.  The press release stated, in relevant part:

> MAYNARD, Mass., May 31, 2017 (GLOBE NEWSWIRE) -- Acacia Communications, Inc. (NASDAQ:ACIA), a leading provider of highspeed coherent optical interconnect products, today announced that the Company has identified a quality issue that it currently believes affects a portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of its three contract manufacturers over an approximate four month period. The Company believes the root cause of this quality issue has been identified as a circuit board cleaning process that has since been eliminated, and manufacturing at this contract manufacturer has resumed. The Company does not believe that products currently being shipped are affected by this quality issue. The Company is actively working with affected customers to remediate this issue. The Company is also working to estimate the cost of these remediation efforts and assess the impact of this issue on its near-term manufacturing capacity.

### The Truth Fully Emerges

### July 14, 2017 Press Release

172.    On July 14, 2017, the Company issued a press release announcing preliminary financial results for the second fiscal quarter ended June 30, 2017, and again provided disappointing guidance for the following quarter.  For the second quarter 2017, the Company reported revenue of $77.0 million to $79.0 million, Non-GAAP net income of $7.0 million to $8.5

million, and Non-GAAP diluted earnings per share of $0.17 to $0.20. For the following quarter, ended September 30, 2017, the Company provided the following guidance: Revenue (millions)— $95.0 to $110.0; Non-GAAP Net Income (millions)—$10.0 to $16.0; and Non-GAAP Diluted Earnings Per Share—$0.25 to $0.40.

173.    Defendant Shanmugaraj reiterated the "quality issue" revealed in the May 31, 2017 press release and specifically noted "supply constraints" experienced by the Company while trying to build replacement units at the same time that the Company was attempting to meet new demand from customers. He, moreover, revealed that the Company did not anticipate completing remediation efforts with respect to the remaining impacted units during the third quarter of 2017. Defendant Shanmugaraj stated, in relevant part:

> Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and manufacturing at the impacted contract manufacturer resumed. Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, we experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for our AC400 and CFP units . . . . We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017.

174.    The press release stated, in relevant part:

> Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced certain preliminary financial results for the quarter ended June 30, 2017 and provided preliminary guidance for its third quarter ending September 30, 2017.

> "Our second quarter results were adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and manufacturing at the impacted contract manufacturer resumed. Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, we experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers for our AC400 and CFP units," said

Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017."

"While we are disappointed with the impact that the quality issue had on second quarter results, looking ahead to the third quarter, we believe we are well positioned to meet customer demand for our products, which we believe continues to be driven by the strength of our product capabilities," said John Gavin, Chief Financial Officer of Acacia Communications. "We remain excited about Acacia's future growth opportunities, and believe that the new products we are currently ramping up will be contributors to our anticipated growth in the second half of 2017 over the first half of 2017."

175.    On this news, the price per share of Acacia common stock fell $2.62, or over 6%, from the previous day's closing price to close at $39.00 per share on July 14, 2017.

### November 2, 2017 Form 10-Q

176.    On November 2, 2017, the Company filed a Form 10-Q with the SEC for the third fiscal quarter ended September 30, 2017 (the "3Q 2017 10-Q"), which stated that the "quality issue" was even worse than described and affected more units than originally estimated, and indicated that the Company's remediation efforts with respect to the remaining impacted units were not completed in the third quarter 2017 -- as the Company had originally anticipated and stated to the investing public.  The 3Q 2017 10-Q stated, in relevant part:

In May 2017, the Company announced a quality issue at one of its three contract manufacturers that affected a portion of the units manufactured by the contract manufacturer over an approximate four month period, which at that time was estimated at approximately 1,300 AC400 units and 5,100 CFP units (the "Quality Issue"). Subsequently, the estimate of the potentially impacted units was increased to approximately 1,900 AC400 units and 7,000 CFP units, to include units manufactured but not yet shipped to customers, and based on an evaluation of such units, the Company established reserves to cover anticipated costs, including cost estimates for product repairs, rework of component inventory with the contract manufacturer and rescreening costs as a result of the Quality Issue. The Quality Issue warranty reserve of $1.1 million was recorded as a component of accrued liabilities in the Company's condensed consolidated balance sheets as of September 30, 2017, and an additional $5.5 million was reserved against estimated affected inventory on-hand at the contract manufacturer and in-transit returns as of September 30, 2017. As compared to June 30, 2017, although the

Company's estimate of the number of potentially impacted units increased, better than anticipated testing data resulted in a decrease to the reserve. The Company's estimates of the Quality Issue costs are subject to further change as customers continue to return potentially impacted units and final testing is performed.

177.    On this news, the price per share of Acacia common stock fell $4.30, or 10%, from the previous day's closing price to close at $39.10 per share on November 2, 2017.  By the close of market on November 3, 2017, the price per share of Company stock fell a further $2.28, or almost 6%, from the November 2, 2017 closing price, closing at $36.82.

178.    The statements referenced above in ¶¶ 118-125, 129-138, 140-153, 156-160, and 163-169 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) prior to and during the FPO, the Company was experiencing declining demand for its products from their top two customers, who had experienced sales and operational issues in the quarter ended September 30, 2016, limiting their demand for the Company's products; (2) the Company had manufacturing issues, causing a disruption in the manufacturing, supply, and sales of its products, and thus Company revenues; (3) a substantial portion of Acacia's sales growth prior to its FPO was due to projects that were practically complete or winding down, including China's 4G infrastructure buildout in a vital market, and shrinking demand for the Company's products; (4) ADVA was experiencing issues rolling out its own cloud-based technology using the Company's products, resulting in a reduction in its demand for the Company's products; (5) the Company had quality issues that affected a portion of the units manufactured by one of the Company's three contract manufacturers, caused by a former circuit board cleaning process used by the Company;

(6) Acacia was suffering from its attempts to remediate the quality issues while also meeting current demand for the Company's products; and (7) the Company failed to maintain internal controls.

179.     Moreover, the statement referenced above in ¶ 171 failed to disclose that: (1) prior to and during the FPO, the Company was experiencing declining demand for its products from their top two customers, who had experienced sales and operational issues in the quarter ended September 30, 2016, limiting their demand for the Company's products; (2) the Company had manufacturing issues, causing a disruption in the manufacturing, supply, and sales of its products, and thus Company revenues; (3) a substantial portion of Acacia's sales growth prior to its FPO was due to projects that were practically complete or winding down, including China's 4G infrastructure buildout in a vital market, and shrinking demand for the Company's products; (4) ADVA was experiencing issues rolling out its own cloud-based technology using the Company's products, resulting in a reduction in its demand for the Company's products; (5) Acacia was suffering from its attempts to remediate the quality issues while also meeting current demand for the Company's products; and (6) the Company failed to maintain internal controls.

180.     In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

181.     Moreover, the Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

182.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, eleven of the Individual Defendants benefitted themselves by engaging in insider sales.

183.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

## DAMAGES TO ACACIA

184.    As a direct and proximate result of the Individual Defendants' conduct, Acacia will lose and expend many millions of dollars.

185.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

186.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

187.    As a direct and proximate result of the Individual Defendants' conduct, Acacia has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

188.    Plaintiff brings this action derivatively and for the benefit of Acacia to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Acacia, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

189.    Acacia is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190.    Plaintiff is, and has been at all relevant times, a shareholder of Acacia.  Plaintiff will adequately and fairly represent the interests of Acacia in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

191.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

192.    A pre-suit demand on the Board of Acacia is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following eight individuals: Defendants Shanmugaraj, Mikkelsen, Swanson, Reiss, Chung, Ritchie, and Roche (collectively, the "Director-Defendants"), and non-defendant David J. Aldrich (together with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

193.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while six of the Director-Defendants

engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

194.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, eleven of the Individual Defendants collectively sold over $327.6 million worth of Company stock at artificially inflated prices based on material inside information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

195.    Additional reasons that demand on Defendant Shanmugaraj is futile follow. Defendant Shanmugaraj currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director.  He received lavish compensation, including $2,393,140 in 2015.  Defendant Shanmugaraj was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings, press releases, and conferences calls referenced herein, almost all of which he personally made statements in or signed.  His large Company stock holding, worth over $56.7 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Moreover, Defendant

Shanmugaraj is a defendant in the Securities Class Action.  Defendant Shanmugaraj's insider sales before the fraud was exposed, which yielded over $15 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Moreover, a significant amount of those shares was sold during the FPO; the FPO Registration Statement failed to disclose required material facts that were known to the Individual Defendants, facts which were purposely omitted by them to increase the Individual Defendants' returns in the FPO, personally benefitting them.  For these reasons, too, Defendant Shanmugaraj breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Mikkelsen is futile follow.  Defendant Mikkelsen currently serves as the Company's CTO, and is thus, as the Company admits, a non-independent director.  His large Company stock holding, worth over $47.9 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and executive of Acacia, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Mikkelsen's insider sales before the fraud was exposed, which yielded over $20.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Moreover, a significant amount of those shares was sold during the FPO; the FPO Registration Statement failed to disclose required material facts that were known to the Individual Defendants, facts which were purposely omitted by them to increase the Individual Defendants' returns in the FPO, personally benefitting them.  He also made false and misleading statements himself, as he signed the 2016 10-K.  Thus, for these reasons, too,

Defendant Mikkelsen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Swanson is futile follow.  Defendant Swanson has served as a Company director since June 2009 and is a member of the Nominating and Corporate Governance Committee.  His large Company stock holding, worth over $154,756 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Swanson's insider sales before the fraud was exposed, which yielded $254,760 in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Moreover, all of those shares were sold during the FPO; the FPO Registration Statement failed to disclose required material facts that were known to the Individual Defendants, facts which were purposely omitted by them to increase the Individual Defendants' returns in the FPO, personally benefitting them.  He also made false and misleading statements himself, as he signed the 2016 10-K.  Thus, for these reasons, too, Defendant Swanson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Reiss is futile follow.  Defendant Reiss has served as a Company director since August 2009 and is Chairman of the Compensation Committee.  His large Company stock holding, worth over $624.4 million before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  Defendant Reiss is a managing member of Matrix VIII US, an investment firm that, through itself and entities

affiliated with it, controlled 27.6% of the Company's outstanding common stock as of March 31, 2017. Thus, he is not independent and cannot adequately consider Plaintiff's demand. As a long-time director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Reiss' insider sale before the fraud was exposed, which yielded over $139.5 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Moreover, all of those shares were sold during the FPO; the FPO Registration Statement failed to disclose required material facts that were known to the Individual Defendants, facts which were purposely omitted by them to increase the Individual Defendants' returns in the FPO, personally benefitting them. He also made false and misleading statements himself, as he signed the 2016 10-K. Thus, for these reasons, too, Defendant Reiss breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Chung is futile follow. Defendant Chung has served as a Company director since April 2013 and is Chairman of the Nominating and Corporate Governance Committee and a member of the Audit Committee and the Compensation Committee. Defendant Chung is Managing Director and CEO of Summit Partners, L.P, which beneficially owns 3.4% of the Company's outstanding stock as of March 31, 2017, and he is on a two-person investment committee responsible for Summit Partners, L.P.'s voting and investment decisions with respect to Acacia. Thus, he is not independent and cannot adequately consider Plaintiff's demand. As a long-time director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Chung's insider sales before the fraud was exposed, which yielded over $96.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, a significant amount of those shares was sold during the FPO; the FPO Registration Statement failed to disclose required material facts that were known to the Individual Defendants, facts which were purposely omitted by them to increase the Individual Defendants' returns in the FPO, personally benefitting them. He also made false and misleading statements himself, as he signed the 2016 10-K. Thus, for these reasons, too, Defendant Chung breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Ritchie is futile follow. Defendant Ritchie has served as a Company director since April 2015 and is Chairman of the Audit Committee. His large Company stock holding, worth over $464,270 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director and Chairman of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ritchie's insider sales before the fraud was exposed, which yielded $379,368 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, a significant amount of those shares was sold during the FPO; the FPO Registration Statement failed to disclose required material facts that were known to the Individual Defendants, facts which were purposely omitted by them to increase the

Individual Defendants' returns in the FPO, personally benefitting them. He also made false and misleading statements himself, as he signed the 2016 10-K. Thus, for these reasons, too, Defendant Ritchie breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Roche is futile follow. Defendant Roche has served as a Company director since June 2016 and is Chairman of the Board. He also serves as a member of the Compensation Committee. He received lavish compensation, including $403,613 in 2016. Defendant Roche is the President and CEO of Analog, a company that Acacia, through its contract manufacturers, purchases supplies from. In fact, during the fiscal year ended December 31, 2016, Acacia's contract manufacturers made purchases from Analog of approximately $4.9 million. Roche is thus not independent, and may fear retaliation against Analog, in addition to himself, if he accepts Plaintiff's demand. As a director and Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also made false and misleading statements himself, as he signed the 2016 10-K. Thus, for these reasons, too, Defendant Roche breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.    Additional reasons that demand on the Board is futile follow.

203.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. In fact, three of the Directors have served on the

Board since the year of the Company's incorporation.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, demand upon the Directors would be futile.

204.    The Director-Defendants violated Section 14(a) of the Exchange Act by at least negligently making the false and misleading statements and omissions in the 2017 Proxy Statement.  Thus, the Director-Defendants face a substantial likelihood of liability, and demand upon them would be futile.

205.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

206.    Six of the Director-Defendants, either directly or indirectly through an investment entity, sold shares of Acacia common stock through the FPO while the price of the Company's stock was artificially inflated due to the Individual Defendants false and misleading statements.  Thus, they face a substantial likelihood of liability and demand is futile as to them.

207.    Acacia has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Acacia any part of the damages Acacia suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

208.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

209.    The acts complained of herein constitute violations of fiduciary duties owed by Acacia's officers and directors, and these acts are incapable of ratification.

210.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Acacia.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the

officers of Acacia, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

211.   If there is no directors' and officers' liability insurance, then the Directors will not cause Acacia to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

212.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

213.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

215.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

216.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

217.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) prior to and during the FPO, the Company was experiencing declining demand for its products from their top two customers, who had experienced sales and operational issues in the quarter ended September 30, 2016, limiting their demand for the Company's products; (2) the Company had manufacturing issues, causing a disruption in the manufacturing, supply, and sales of its products, and thus Company revenues; (3) a substantial portion of Acacia's sales growth prior to its FPO was due to projects that were practically complete or winding down, including China's 4G infrastructure buildout in a vital market, and shrinking demand for the Company's products; (4) ADVA was experiencing issues rolling out its own cloud-based technology using the Company's products, resulting in a reduction in its demand for the Company's products; (5) the Company had quality issues that affected a portion of the units manufactured by one of the Company's three contract manufacturers, caused by a former circuit board cleaning process used by the Company; (6) Acacia was suffering from its attempts to remediate the quality issues while

also meeting current demand for the Company's products; and (7) the Company failed to maintain internal controls.

218.    Moreover, the 2017 Proxy Statement was false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failure to abide by them and to their making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

219.    The 2017 Proxy Statement also falsely and misleadingly suggested that adequate internal control, compliance, disclosure review, and reporting programs were maintained by the Board to mitigate misconduct and to apprise the Board of any significant risks.  Moreover, the 2017 Proxy Statement suggested that the Audit Committee adequately reviewed Acacia's financial statements and disclosures, and monitored disclosure and internal controls to ensure that they were effective.  While the 2017 Proxy Statement provided information regarding the aggregate proceeds garnered by certain Individual Defendants in the FPO, it failed to disclose that several of the Individual Defendants, including Defendants Shanmugaraj and Mikkelsen who were being voted on for re-election, had made sales of personally held Company stock while the price per share of Company stock was artificially inflated due to the false and misleading statements discussed herein and while they were in possession of non-public, material, adverse information.

220.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination

in the 2017 Proxy Statement, including election of directors and appointment of an independent auditor.

221.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

222.    Plaintiff on behalf of Acacia has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Acacia's business and affairs.

225.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

226.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Acacia.

227.    In breach of their fiduciary duties owed to Acacia, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) prior to and during the FPO, the Company was experiencing declining demand for its products from their top two customers, who had experienced sales and operational issues in the quarter ended September 30, 2016, limiting their demand for the Company's products; (2) the Company had manufacturing issues, causing a disruption in the manufacturing, supply, and sales of its products, and thus Company revenues; (3)

a substantial portion of Acacia's sales growth prior to its FPO was due to projects that were practically complete or winding down, including China's 4G infrastructure buildout in a vital market, and shrinking demand for the Company's products; (4) ADVA was experiencing issues rolling out its own cloud-based technology using the Company's products, resulting in a reduction in its demand for the Company's products; (5) the Company had quality issues that affected a portion of the units manufactured by one of the Company's three contract manufacturers, caused by a former circuit board cleaning process used by the Company; (6) Acacia was suffering from its attempts to remediate the quality issues while also meeting current demand for the Company's products; and (7) the Company failed to maintain internal controls.

228.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

229.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

230.    Additionally, eleven of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

231.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of Acacia's securities and disguising insider sales.

232.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Acacia's securities and engaging in insider sales.

233.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

234.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Acacia has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235.     Plaintiff on behalf of Acacia has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

236.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Acacia.

238.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Acacia that was tied to the performance or artificially inflated valuation of Acacia, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

239.    Plaintiff, as a shareholder and a representative of Acacia, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

240.    Plaintiff on behalf of Acacia has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

241.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

242.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Acacia, for which they are legally responsible.

243.    As a direct and proximate result of the Individual Defendants' abuse of control, Acacia has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Acacia has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

244.    Plaintiff on behalf of Acacia has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

245.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

246.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Acacia in a manner consistent with the operations of a publicly-held corporation.

247.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Acacia has sustained and will continue to sustain significant damages.

248.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

249.    Plaintiff on behalf of Acacia has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

250.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

252.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Acacia to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to

engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

253.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

254.    Plaintiff on behalf of Acacia has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Acacia, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached their fiduciary duties to Acacia;

(c)    Determining and awarding to Acacia the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Acacia and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Acacia and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Acacia to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Acacia restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: December 22, 2017                     Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Matthew H. Lee*
Matthew H. Lee (#697115)
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: mlee@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Josh Baker (#695561)
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jbaker@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

DocuSign Envelope ID: CF4A0CF9-73F5-4DDF-B26C-A83996C401EE

## VERIFICATION

I, Jonathan Wong, am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of December, 2017.

12/16/2017

DocuSigned by:

*Jonathan Wong*

377FCBA49F40480

Jonathan Wong